*208 The ©pinion of'the Court was delivered by
WakdlJlW, Ch.
George A. 0. Rivers, of Wadmalaw, died August 6, 1840, leaving a will and codicil, both bearing date August 5, 1840, written while he was in extremis — the former by his overseer, and the latter by his attending physician, and attested by these two persons and a third neighbor. The operative words of the will are the following: “ I wish the two hundred acres of land, purchased from Mr. Benjamin Reynolds, reserved during the natural lifetime of my beloved wife, as a residence for her and any of my daughters who may remain single. When my executors deem it necessary to divide my property, equally among my wife and children, to share alike, the property I have already given my son Robert shall be considered a portion of which he is entitled from my estate. I appoint, as my executors, H. Wilson, Jr., John Hannahan and S. King.” And the operative words of the codicil are: “ I desire that my servants, James and his family, March and his family, excepting his son Caesar, Binah and her daughter, and husband Jemmy, be reserved as the attendants on my wife and younger children.” Upon the death of testator, his immediate family were a widow, Martha S. Rivers, and eight children by a former wife. Of these children, the elder five were sons and the younger three were daughters-All of the children were then under the age of twenty-one years, except the eldest, Robert, who was living on land of Ms father, in St. Paul’s Parish, and to whom his father had given Caesar and three other slaves. Of the daughters, one is dead, one married, and the youngest of full age and unmarried. The widow still resides on the tract reserved, but none of the children of testator resides with her. It does not appear what was the number of slaves reserved as attendants at the time of testator’s death, but in Eebruary, 1843, they were eighteen, and in June, 1856,. they were twenty-seven. Some of these are employed in agricultural operations.
This bill is instituted by the youngest son of testator (this *209 son being eleven years and five months old at his father’s death), against the widow and surviving children of testator, for partition of the reserved negroes equally among said widow and children. The bill proceeds on the assumption that the will provides for the distribution of these slaves on either of two events, the attainment to full age of the youngest child, or the death of the widow. His brothers and sisters substantially adopt the plaintiff’s bill, and concur in its prayer, but the widow insists that, according to the proper intepretation of the testamentary papers, she is entitled to a life estate in these slaves, subject to a joint use with such of the younger children as may reside with her. The Chancellor adopted, doubtingly, the construction suggested in behalf of the widow, and dismissed the bill, and the children of testator appeal from his decision.
Much of the reasoning of the Chancellor is entirely satisfactory to us. Still we prefer a construction of these brief and obscure testamentary instruments somewhat different from that he has adopted.
The testator has effectually expressed his intention to give his estate generally, in equal shares, among his wife and children. His direction to his executors so to divide his estate, plainly amounts to a donation of the fee to the wife and children, as tenants in common with equal interests. Bankhead vs. Carlisle, 1 Hill, Ch. 357. The executors, however, were directed to divide the property when they might deem it necessary, and this direction, by necessary implication, conferred on them authority to make partial divisions from time to time, always preserving the fundamental principle of equality. Testator chose, however, to make some express reservations for the benefit of his wife and more helpless children, and to this extent to limit the discretion of his executors, for a time, in making division. By the will, he reserved a tract of land as a residence for his wife and for his daughters remaining single, during the life of his wife; and by the *210 codicil Re reserved certain slaves as attendants of Ms wife and younger cMldren. In neither of these reservations is any estate actually given, and the property reserved is left subject to the general disposition in equal shares, although the privilege of using it for specified and temporary purposes is given to favored legatees. There is a difference in the language of the two reservations, which is not surprising, as they were written by different scriveners — the former fixing a period for the use, the life of the wife, and naming the unmarried daughters as recipients of the use in common with the wife ; the latter fixing no time for enjoyment of the privilege, and mentioning the wife and younger children as the persons to be favored. But it is at least probable that the intention of the testator was identical in both as to time and objects. The codicil may be well considered as a mere appendix to the reservation in the will, and, as intended, adding new subjects for the benefit of the same persons and for the same time. Construing the codicil by its context in the will, we suppose that suit and service of the reserved slaves are inseparably connected with residence on the reserved land. The benefits are to be enjoyed in common and at one place. No advantage of one over the others, the widow or daughters remaining single, is intimated as to residence in the reservation of the will; nor any advantage as to the attendance of the servants, between the widow and younger children, in the codicil. Naturally the widow, as head of the household, in any contest between herself and the younger children as to residence and attendance, would deserve favorable consideration; still she has no title in these respects absolutely superior. If, for any cause, she should remove from the homestead, her removal would forfeit her right to the attendance of the servants, but not impair the right of the single daughters to residence and attendance. So the removal of the younger children would forfeit their right to attendance, and not affect the widow’s claims to both benefits.
*211 Ye have intimated onr opinion that the phrase “younger children,” in the codicil, means the daughters of testator; but we reserve the point from judgment, as the daughters, by making common cause with the plaintiff, adopt his construction of the meaning of “ younger children.” It is suggested, that if we would hear the testimony of the attesting witnesses, as to the parol declarations of the testator at the time these papers were executed, concerning his purposes, all doubt on this point would be removed; but such testimony is palpably incompetent, and in violation as well of the statutes requiring wills to be in writing, as of the principles of common law inhibiting explanation of written instruments by verbal commentaries of the makers. A will must be interpreted by the words used therein, although it is quite proper to ascertain the application and meaning of the words in the light of the circumstances surrounding the testator when it was executed. Thus, when we find, in this ease, that the younger three children of testator were infant and unmarried daughters, and his other children sons; that, in the context, he gives a privilege of residence to these daughters while single, and no such privilege to the sons; and in the text adds, probably in promotion of the comfort of the residents, the attendance of certain servants on his younger children, — it might be legitimate to conclude, that the testator meant his daughters by the phrase “ younger children ” in the codicil, but it would be altogether against principle to ascertain by extrinsic proof that such was really his meaning. The term “younger” is comparative, and when applied to a class is satisfied in meaning by any division of the class into two parts, with respect to age. The phrase “yottnger children” has been frequently submitted to judicial interpretation, and the course of decisions demonstrates, that it admits of great latitude of construction. In England it has been held to include children who do not take the family estate, whether younger or not, as in the case of an eldest daughter or an eldest son unprovided for, and to *212 exclude a child taking the estate, whether elder or not, as in the case of the youngest child, who happens to be a son, entitled to take the estate. In this State, where the law of primogeniture is abolished, and all children are equal distributees of the estate, we should hold generally, according to the natural import of the terms, that younger children are all the children except the eldest, but that the context may easily deflect the import of the terms-. 2 Jarm. Wills, 84 (116). But this is enough, and too much, on a matter reserved from absolute judgment.
We agree with the Chancellor, that the widow is entitled to attendance from the slaves reserved so long as she resides at the home reserved by the testator, — during her life, if she continues to reside there. It may be repeated, that no estate is given to her, and no preferable privilege in the use of these slaves over the younger children, except such as may be inferred from her position as head of the house; and that this privilege is to be enjoyed by herself and the children at the homestead. For is any exclusive use of the slaves intended to be reserved for kter; the younger children have a common right. It seems to us, that the reservation of the slaves was made for a special purpose — attendance upon the persons or in the household of those for whose benefit it was made — and that no title to the slaves for other purposes, such as employment in agricultural pursuits, was intended to be conferred. A stock of slaves was set apart for the purpose of securing this attendance, but there was no bequest of the slaves to those who were to be waited upon. It is analogous to a case where, without gift of the fund to the children, a fund is provided by a testator', out of which they may be maintained and educated. In Whilden vs. Whilden, Riley, Ch. 205, we have express authority, that in such case the children are entitled to so much only of the fund as may be necessary for their maintenance and education, to be varied, under the direction of the Court, as the exigencies of the children may *213 require. Chancellor Harper says, “A direction for maintenance means, of course, what may be necessary for maintenance.” And further: “ Suppose the fund were large enough to produce an income more than double what was required for the maintenance of the children, can it be supposed that they would be entitled to divide the whole income, when nothing but maintenance is provided for ?” The Chancellor quotes the cases of Rawlins vs. Goldtrap, 5 Ves. 440, and Maborly vs. Tarton, 14 Ves. 499, which seem to support his views. The present case is considered to be within the principle of Whilden vs. Whilden.
It is not meet, however, to grant partition of these slaves, or any of them, in the present posture of affairs. Whenever partition be made, the shares of the wife and children must be equal; and if the widow have no need of all the slaves as attendants, partition of the income arising from the supernumerary slaves must be made on the same principle. The inexpediency of partition of the corpus now, is demonstrable from the fact that the widow is entitled to have so many of these slaves as she needs, as attendants upon her, and her need in this respect will vary according to the change of her circumstances and of the condition of the slaves. It may be that all, or half, or one-fourth, of these slaves are now necessary to proper attendance, and that a greater or smaller portion will be required next year. If a specific number was assigned to her for this .purpose, it might happen that, by death of the slaves, or some other casualty, this number would become, in event, quite insufficient.
It is ordered and decreed, that the circuit decree, dismissing the bill, be set aside, and that it be referred to the Master, to • inquire and report whether all the slaves in question be necessary as attendants on Martha S. Rivers; and if all be not necessary, whether the surplus should be left in her possession, on reasonable hire, or be otherwise let to hire.
Johnstost and DuirKiN, 00., concurred.